Phinney v. Paulshock, et al.          CV-97-45-JD    06/04/98   P

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

Linda S. Phinney, et al.

    v.                                    Civil No. 97-45-JD

Craig L. Paulshock, et al.

## O R D E R

    Plaintiffs' motion for sanctions (document no. 51) and defendants' motion to strike (document no. 59) arise out of a medical malpractice action concerning the death of Kenneth J. Phinney on March 19, 1996 during surgery for a brain aneurism. Plaintiffs assert that Kenneth Bouchard, who is the attorney for both Atlantic Anesthesia ("AA") and Dr. Craig Paulshock (collectively "defendants"[1]), impermissibly coached a deponent during her deposition.  Plaintiffs also assert that defendants and/or their attorney wrongly failed to comply with legitimate discovery requests, and that defendants and/or their attorney fabricated evidence.  Defendants seek to strike these allegations from the record and seek Rule 11 sanctions.  The court conducted a hearing into the matter on March 20, and from March 31 to April 3, 1998.

---

[1] There are several defendants in the underlying case that are not the objects of plaintiffs' sanctions motion. Hereinafter, for convenience's sake when I refer to "defendants" I mean only AA and Dr. Paulshock.

## I. Background

## A. Undisputed Facts in the Underlying Case

Kenneth Phinney was a 38 year old married father of two minor children. He and his family lived in Eliot, Maine. He worked at the Portsmouth Naval Shipyard.

On the evening of Saturday, March 16, 1996, Mr. Phinney complained of a very severe headache. Feeling no better the next day, he went to the emergency room of Wentworth-Douglass Hospital in Dover, N.H. He was admitted and a brain aneurism was diagnosed.

Mr. Phinney went into surgery for a craniotomy to repair the aneurism at approximately 11:00 a.m. on Tuesday, March 19, 1996. The lead neurosurgeon was Dr. Clinton Miller, assisted by Dr. Carlos Palacio. The anesthesiologist was Dr. Craig Paulshock, an employee and shareholder of AA. He was assisted by nurse anesthetist Elise Jackson, an employee of AA. After the operation was underway, Dr. Paulshock left the operating room ("OR") leaving Nurse Jackson responsible for the anesthesia. Shortly before 1:50 p.m., nurse anesthetist Patricia Daley, another AA employee, entered the OR to assist with the procedure. At 1:50 p.m., Nurse Jackson intravenously administered Nimodipine, an oral medication, in a dosage suitable for oral

administration.[2]  At 2:03 p.m. Mr. Phinney experienced a precipitous drop in blood pressure accompanied by electro-mechanical disassociation.  At 2:10 p.m. a "code" was called, indicating that the patient was in cardiac arrest and setting into motion a concerted resuscitation effort.

Dr. Paulshock returned to the OR as the crisis ensued.[3] Upon his entry into the OR, Nurse Jackson informed him that she had administered Nimodipine to the patient.[4]  Dr. Paulshock's partners, Dr. Nathan Jorgensen and Dr. James Tobin, responding to the code, entered the OR shortly thereafter.  Dr. Jorgensen inserted a subclavian triple lumen central venous pressure ("CVP") catheter into the patient, in part to search for an air embolism that could be causing the arrest.[5]  He subsequently

_____

[2] Who said what to whom concerning the appropriateness of administering Nimodipine intravenously are disputed facts in the underlying case but of little relevance to the sanctions motion. It is undisputed, however, that Nurse Jackson administered an overdose of Nimodipine and that cardiac arrest can result from such an overdose.

[3] There is some discrepancy as to precisely when Dr. Paulshock returned to the OR.  In his "Quality Assurance" statement, Dr. Paulshock stated that he initiated the code.  At the hearing, OR Nurse Elaine Starkey testified that she initiated the code.

[4] What Nurse Jackson said to Dr. Paulshock, and what Dr. Paulshock said in reply, are disputed facts that are relevant to the sanctions motion, and will be discussed fully below.

[5] What Dr. Jorgensen found and what he and others saw are disputed facts that are relevant to the sanctions motion and will

3

inserted a "Swan-Gantz" catheter for the same purpose.  Mr. Phinney was pronounced dead at 2:40 PM.

**B. Evidence Relevant to the Allegations of Sanctionable Conduct[6]**

### 1. The Presence or Absence of a Finding of Aerated Blood

One allegation of defendants' sanctionable conduct concerns a written statement by Dr. Jorgensen that he aspirated six or seven syringes of frothy blood from Mr. Phinney via the CVP catheter.  A finding of true aerated blood could indicate the existence of a venous air embolism, which could explain Mr. Phinney's cardiac arrest.[7]  Plaintiffs allege that Jorgensen's statement that he withdrew aerated blood consistent with a venous air embolism was fabricated by defendants either with or without the assistance of Attorney Bouchard.

---

be discussed fully below.  One issue is whether Dr. Jorgensen truly believed that the "frothy" blood he claims to have withdrawn was "aerated" blood characteristic of a venous air embolism.

[6] The following section summarizes evidence relating to plaintiffs' allegations that defendants and/or Attorney Bouchard: (1) fabricated a finding of aerated blood; (2) hid discoverable documents; (3) coached Nurse Daley to change her deposition testimony; and (4) made coaching objections and statements during Nurse Daley's October 27, 1997 deposition.  These facts also bear upon defendants' motion to strike.  To the extent that there are discrepancies in the evidence presented, I have presented them in this section and will discuss their significance later.

[7] Evidence of a venous air embolism would tend to exculpate AA of fault by offering an explanation for Mr. Phinney's death other than the overdose of Nimodipine administered moments before by Nurse Jackson.

4

Attorney Bouchard testified that he was engaged to defend AA within days of Mr. Phinney's death.  He learned from Dr. Paulshock soon after his engagement about the potential defense of an air embolism.  He asked Dr. Paulshock to record his recollections of the circumstances surrounding Mr. Phinney's death, and asked him to relay that request to his partners as well.  Dr. Paulshock testified that he made that request by note to his partner, Dr. Jorgensen.

In a memorandum dated April 1, 1996, Dr. Jorgensen purported to record his role in the events surrounding Mr. Phinney's death ("Jorgensen memorandum").  The memorandum states that:

> [b]ecause venous air embolism is a potential cause of arrest in a patient undergoing a craniotomy, I placed a subclavian triple lumen CVP into the right superior vena cava/ atrium.  I began to aspirate from the port to the distal lumen using a 20 cc syringe.  I was able to aspirate frothy blood.  There was air noted in the clear portion of the distal port lumen continuously as I aspirated.  This seemed to confirm the likely diagnosis of venous air embolism.  The central line was aspirated until no more air returned - six to seven 20cc syringes with a 50 /50 blood air mix.

Plaintiff's Exhibit No. 1 (hereinafter "Notebook")[8], tab 1.

At the top of the memorandum, written in a manner to suggest that Jorgensen's memorandum was responsive, is a handwritten note stating "Nathan - please report your observations involving the

---

[8] This exhibit is a red notebook submitted by plaintiffs containing most of the documents relevant to this inquiry.  It is subdivided by tabs bearing numbers, letters or subject headings.

5

events in the case of K. Phinney on 3-19-96. Your statement will be filed in anticipation of litigation involving me, Atlantic Anesthesia, etc. Thanks. CP." Id. At the hearing, Dr. Paulshock admitted that he wrote this note onto the Jorgensen memorandum after Jorgensen prepared it but claimed that it was the same as the note he had previously written to Dr. Jorgensen.

Plaintiffs became aware of the contents of the Jorgensen memorandum during the deposition of Dr. Paulshock on September 30, 1997 and requested its production at that time. The Jorgensen memorandum had been listed on defendants' privilege log provided to plaintiffs on June 23, 1997. See Notebook, tab 3. Defendants decided to waive the previously asserted privilege and produced the memorandum to plaintiffs on October 3, 1997.

Prior to Dr. Paulshock's September 30 deposition, and the production of the Jorgensen memorandum, there had been no evidence advanced to support the theory that an air embolism contributed to the death of Kenneth Phinney. None of the documents produced or deposition testimony taken prior to September 30, 1997 mentioned a finding of aerated blood. None of the medical records indicated that air was aspirated from the patient.[9]

---

[9] Documents from the medical record submitted for this court's consideration are contained at the back of the Notebook.

6

Dr. Miller, the neurosurgeon, testified that Dr. Jorgensen did not withdraw aerated blood of the type indicative of a venous air embolism from Mr. Phinney. Every effort by Dr. Jorgensen to aspirate air from Mr. Phinney was observed by Dr. Miller. Dr. Miller stood no more than eighteen inches from Dr. Jorgensen as the latter inserted the catheter into Mr. Phinney's neck, had an unobstructed view of what Dr. Jorgensen was doing, and was watching Dr. Jorgensen intently throughout the entire attempt to aspirate air. Dr. Miller stated that Dr. Jorgensen had great difficulty inserting the CVP line due to a lack of blood in the vein.

Eventually Dr. Jorgensen placed the line, threaded the catheter and attached the "Luer-Lok" (the type of syringe used). He attempted to pull back the plunger of the syringe but could not, despite the use of some force. The syringe had some blood in it, which Dr. Jorgensen squirted out. He then reattached the syringe to the catheter and pulled back very, very hard on the plunger. This time he got blood and some air, amounting to a half a syringe of foam. Dr. Miller testified that the air probably leaked into the syringe from one of the connections due to the extreme force used by Dr. Jorgensen. Dr. Miller further testified that the blood and air withdrawn by Dr. Jorgensen did

7

not resemble aerated blood caused by a venous air embolism.[10]
Dr. Jorgensen emptied the syringe, reattached it and pulled a
third time. This time he aspirated only blood. Dr. Miller
testified that Dr. Jorgensen aspirated nothing further.[11]

Dr. Jorgensen testified at the hearing that he had
difficulty inserting the CVP line due to an absence of blood in
the vein. He stated that once the catheter was in place, he
aspirated six or seven syringes of blood/air mixture and made the
rest of the OR aware of his finding. He qualified that statement
by noting that this estimate of the quantity aspirated was merely
his best guess and that the quantity may have been less. Dr.
Jorgensen stated that during the resuscitation effort he and Dr.
Miller discussed whether in fact aerated blood was being
aspirated. Jorgensen acknowledged that Dr. Miller was certain it

---

[10] Dr. Miller, a board certified neurosurgeon and previously
a professor of neurosurgery, stated that he had observed the
aspiration of aerated blood associated with an air embolism in
the course of his teaching, but not in connection with any of his
own patients at Wentworth-Douglass Hospital. He explained that
aerated blood results from the presence of an air bubble inside
of the heart; he elaborated that the action of the heart whips
the air and any blood present into a pinkish froth, similar in
appearance to a beaten egg white or meringue.

[11] The operative report of Dr. Miller, dictated a few hours
after Mr. Phinney's death, adds that "[a]lthough the heart was
repeatedly aspirated for air, no convincing evidence of an air
embolism was ever obtained and, in fact the precordial and
esophageal stethoscopes did not reveal the typical whirling sound
of acute cardiac tamponade by air." Notebook, "Operative Report"
tab, p. 3.

8

was not aerated blood, that Miller believed any air present was merely due to a leak around the Luer-Lok, and that he was persuaded at that time by Dr. Miller's opinion. Dr. Jorgensen described what he saw as blood with bubbles in it coming back through the lumen of the catheter and frothing up in the syringe. He attached no significance to the absence (noted by Dr. Miller) of a whirling noise from Mr. Phinney's heart.

Dr. Jorgensen testified at the hearing that sometime later he reconsidered what had happened and adopted the belief that he had aspirated aerated blood. This reconsideration happened to occur after he and his partners learned that their employee had administered a lethal dose of Nimodipine to Mr. Phinney. He put this reconsidered opinion into his April 1 memorandum. Dr. Jorgensen did not state whether he had ever previously seen aerated blood caused by an air embolism. He had no explanation as to why a finding of frothy blood was not noted in the hospital record. He stated that he had not personally ensured the notation of his finding because it was not his case and he was merely assisting in an emergency.

Dr. Tobin, another anesthesiologist and AA partner, testified that he was present when Dr. Jorgensen attempted to aspirate air from the patient. He said that he could see the syringe but not the lumen of the catheter and that he saw Dr.

Jorgensen aspirate four to five syringes of blood/air mixture. He described what he saw in the syringe as lighter in color than normal blood and semitransparent. He did not state whether he had ever previously seen aerated blood due to an air embolism. He did not recall any announcement that air was found, but he did recall Jorgensen and Miller discussing possible sources for air. He also could not explain why there was no notation in the hospital record as to a finding of air.

Dr. Paulshock testified at the hearing that he saw a substantial quantity of air withdrawn from the CVP catheter. He stated that he was flabbergasted and shocked by the amount of air withdrawn. He added that every time he looked up more air was being recovered and that this recovery continued for a surprisingly long period of time. He had no idea why there was no notation of air in the record; he stated Jorgensen should have noted it and had he withdrawn the air, he would have done so.

Dr. Paulshock also testified that he made a quality assurance ("QA") report of Mr. Phinney's death dated March 26, 1996. The so-called QA report[12] noted the aspiration of three or four syringes of blood/air mix and air bubbles in the clear part of the catheter, "rul[ing] against a loose connection between the

_____

[12] The only basis for concluding that the document is, in fact, a quality assurance report is Dr. Paulshock's testimony.

10

syringe and the catheter connector." Bouchard Exhibit C. Dr. Paulshock's QA report does not distinguish between events actually witnessed by him and second-hand accounts collected by him.

Also testifying at the hearing were Nurse Elaine Starkey, Surgical Technician Szymanski, Nurse Laurel Pritchard, Nurse Anesthetist Patricia Daley and Nurse Deborah Hendrickx-Smith, all of whom were in the OR during the code. None have any recollection of air having been withdrawn during the resuscitation efforts. Nurse Daley, who has been a nurse-anesthetist since 1972 and at Wentworth-Douglass since 1977, does not recall ever having seen aerated blood from an air embolism. The court accepted an offer of proof concerning the observations of Dr. Lance Briggs, the cardiologist present in the OR during the code. He would have testified that he recalls the insertion of the CVP catheter, but does not recall the aspiration of a blood/air mixture.

### 2. Elise Jackson's Personnel Evaluations

Another allegation of sanctionable conduct by defendants arises in connection with defendants' failure to disclose in a timely manner Elise Jackson's personnel evaluation summary and the individual evaluations completed by the AA doctors upon which

11

the summary was based.[13]  Plaintiffs allege that defendants and/or Attorney Bouchard wrongly withheld the potentially damaging evaluations, which were responsive to legitimate discovery requests.

According to defendants, AA decided in December 1995 to fire Elise Jackson due to their dissatisfaction with her job performance.  They also decided that they would not terminate her until they had found a replacement.  Concerned with their vulnerability to a lawsuit by Nurse Jackson, the doctors of AA decided to conduct a comprehensive personnel evaluation of all the nurses so that they could base the decision to fire Nurse Jackson on objective evidence.[14]

Dr. Ollar, another AA shareholder,[15] drafted "evaluation questionnaires" for his partners to fill out rating the nurses in

_____

[13] The "individual evaluations" and the "evaluation summary" are identical, except that each of the former is a single evaluation filled by one physician while the latter is a composite of each physician's evaluation.  See Notebook, tab 7 and tab 16.  They are both, however, entered onto identical "questionnaire" forms.  The individual evaluations are sometimes referred to as "evaluation questionnaires," "questionnaires," or "surveys."  The evaluation summary is also referred to as the "summary evaluation," "summary," or "composite evaluation."

[14] Attorney Bouchard testified at the hearing that soon after he was first engaged, Dr. Paulshock told him about AA's decision to fire Elise Jackson; Paulshock did not, however, discuss the evaluations with Bouchard at that time.

[15] He was not involved in the events surrounding Mr. Phinney's death.

a number of categories relating to their job performance.[16]  He collected the results and entered the averages of the responses for each nurse onto an identical questionnaire form, which has been termed a "summary evaluation."  On her summary evaluation, Nurse Jackson was rated as below average in efficiency, honesty, personality, technical facility, adaptability and dependability.  See Notebook, tab 7.  Dr. Paulshock rated her "poor" on honesty, the lowest possible grade.  See Notebook, tab 16.  AA terminated her employment on April 22, 1996.

On April 15, 1997, plaintiffs sent defendant AA interrogatories and requests for production of documents.  Among other things, plaintiffs requested personnel-related documents and information on Elise Jackson.[17]  On April 18, Attorney Bouchard sent the interrogatories to Dr. Paulshock, who at some

---

[16] The categories were: safety, ability to work independently, self directed to useful tasks, efficiency, honesty, follows directives, availability, personability, technical facility, adaptability, and dependability.  A "1" was rated as poor, a "3" as average and a "5" as excellent.  See Notebook, tab 16.

[17] Specifically, interrogatory 22 requested "a complete copy of Elise Jackson's personnel file and employment contract or other documentation describing her relationship with Atlantic Anesthesia, P.A."  Interrogatory 26 requested "all discipline records, reprimands, notes, personnel files, memoranda, reports, or any other document related to the professional competence, skill, adherence to procedures, or abilities of any . . . nurse . . . involved in . . . the treatment provided to Kenneth J. Phinney on March 19, 1996." Notebook, tab 2.

13

point passed them to Dr. Ollar. On May 23, Bouchard's paralegal faxed Dr. Paulshock to inquire after Elise Jackson's personnel documents. <u>See</u> Bouchard Exhibit B.,[18] 5/23/97 Polinski-Paulshock Facsimile.

Dr. Ollar answered and signed the interrogatories for AA. On June 23, 1997 AA sent its responses to plaintiffs. In response to interrogatory 22, AA provided plaintiffs with Nurse Jackson's employment contract and some other administrative documents. In response to interrogatory 26, defendants objected to the question on the basis of attorney-client, work product or quality assurance privilege, but "without waiving these privileges [stated] that no one was reprimanded." Notebook, tab 5. Attorney Bouchard explained at the hearing that the privilege objection did not refer to the evaluations (which he did not know about at the time he prepared the privilege log), but referred only to documents listed on the log that he felt may be responsive to the question. None of the responses made reference to the existence of the personnel evaluations. On June 26, Attorney Bouchard confirmed to plaintiffs' counsel that there were no more documents in Elise Jackson's personnel file.

_____

[18] This exhibit is a thick collection of documents mainly containing Attorney Bouchard's office records. It is not paginated and has no tabs, but the documents contained therein are arranged chronologically, so that the reader can find the referenced document by noting its date.

14

At the hearing, Dr. Ollar testified that the evaluation summary and individual evaluations were responsive to plaintiffs' interrogatories 22 and 26, but he did not produce them because he could not find them. Dr. Ollar claims that he searched for the documents at home and in a filing cabinet at AA's small office at Wentworth-Douglass Hospital. He also claims that he asked both AA's bookkeeper and Dr. Paulshock to look for the documents. Despite these purported search efforts, Dr. Ollar does not recall ever telling Attorney Bouchard about the existence of the documents. Those personnel documents which were produced on June 23 in response to interrogatories were located in the AA filing cabinet at Wentworth-Douglass Hospital. This is the same filing cabinet where the evaluations were later found by Dr. Ollar.

The first reference in the record to Nurse Jackson's evaluation summary took place during her June 27, 1997 deposition. See Bouchard Exhibit B. Attorney Bouchard testified that this was the first time he had heard about any evaluations. He stated that he spoke to Dr. Paulshock within a day or two of the deposition[19] about the evaluation. He also learned at that time of the existence of subsidiary documents upon which the evaluation summary was based, but was unclear as to their nature.

---

[19] Dr. Paulshock had attended the June 27 Jackson deposition.

He told Dr. Paulshock that if _any_ evaluation forms existed they had to be produced.  Dr. Paulshock recalled that conversation, testifying that he discussed the evaluations with Bouchard, but that perhaps he had not made clear to Bouchard that there were multiple evaluations for each nurse, including Elise Jackson.  He attributed his lack of clarity to the vagaries of the English language.

In a June 30 memorandum, Bouchard directed his associate, Lynmarie Cusack, to follow up on matters relating to the Phinney case while he was on vacation, including the whereabouts of the evaluation summary.[20]  _See_ Bouchard exh. B.  In a letter dated July 2, Attorney Bouchard requested that Dr. Ollar provide him with a copy of the evaluation summary.[21]  Cusack placed a follow-up call shortly thereafter.  On July 8, Dr. Ollar called Cusack

---

[20] He also directed her to send copies of all interrogatories and Elise Jackson's deposition transcript to Dr. Paulshock.  Bouchard testified that Dr. Paulshock had requested copies of all the _other_ parties' interrogatories and his office complied with this request; he did not believe, however, that copies of AA's interrogatories were sent to him at that time since that was not the intent of Paulshock's request.  Bouchard had, however, previously sent AA's interrogatories to Dr. Paulshock.  _See_ Bouchard Exhibit B, 4/18/97 Bouchard-Paulshock letter.  Dr. Paulshock testified, inconsistently, that he never got a copy of AA's interrogatories.

[21] That letter also makes reference to the conversation Bouchard had with Dr. Paulshock about the evaluation.  A July 3, 1997 letter from Bouchard to Gavin Fritton, senior claims attorney for AA's insurer, also recounts the Bouchard-Paulshock conversation.  _See_ Bouchard exh. B-1.

16

to say that Bouchard's office had everything AA had.  See id.

On July 9, Cusack both called and wrote to Janet Kathios, AA's bookkeeper, asking her to look for Jackson's evaluation. See Bouchard Exhibit B, 7/9/97 Cusack-"Janet" letter.  In reply, Dr. Paulshock called her on July 9.  Cusack's notes of that conversation indicate that Dr. Paulshock told her that AA had no further documents on Elise Jackson.  He also mentioned to her that there had existed "surveys" completed by the doctors and that these were separate and distinct from the "evaluation" sought by plaintiffs.  See Bouchard Exhibit B, 7/10/97 Cusack Memorandum.  Attorney Bouchard testified that he did not read Cusack's memorandum to the file until very recently.  Dr. Paulshock testified that he recalled this conversation and that he understood Cusack to tell him that only the evaluation summary was required.

Meanwhile, Dr. Ollar had found the individual evaluations and the summaries for all the nurses in the same AA filing cabinet at AA's hospital office in which he found Elise Jackson's other personnel documents.[22]  Plaintiffs' counsel did not, however, learn that the individual evaluations had been found despite several requests, until Dr. Ollar's October 27, 1997

---

[22] Dr. Ollar testified at the hearing that he ran across the evaluations by accident while looking for something else entirely.

17

deposition. At his deposition, Dr. Ollar said that he found the evaluations before the summer and gave them to Dr. Paulshock at that time. Dr. Ollar testified differently at the hearing, stating that he found the documents in late July or early August and that he gave them to Dr. Paulshock then, and not before the summer as he had previously testified. Dr. Ollar explained that he gave the documents to Dr. Paulshock because Paulshock had the closest relationship with Attorney Bouchard; he assumed that Dr. Paulshock would give the documents to Bouchard.

Dr. Paulshock testified at the hearing that he received all the individual evaluations and all the evaluation summaries from Dr. Ollar some time between July 10 and August 22. As his hearing testimony progressed, Dr. Paulshock narrowed his receipt of the documents to late July or early August. He testified that as a result of his conversation with Cusack, he believed that plaintiffs only wanted Elise Jackson's evaluation summary. Dr. Paulshock testified that after Dr. Ollar gave him the documents, they were left in a pile at AA's office in the hospital for some time.

Dr. Paulshock testified that in mid/late August he told someone in Bouchard's office, perhaps a secretary, that he had both Elise Jackson's evaluation summary and the individual evaluations, and that person told him that only the summary was

required.  There is no record in evidence of this telephone conversation.  Dr. Paulshock further testified that he removed Elise Jackson's summary from the pile of individual evaluations at the hospital and sent it, without a cover letter or any indication of its origin, to Attorney Bouchard in mid/late August.  Dr. Paulshock later testified that the pile of evaluations may have been at his home when he removed the summary from it.  In any event, inexplicably, Dr. Paulshock testified that he had no recollection of taking the file home and assumed that Dr. Ollar had taken the documents back after the Jackson summary had been forwarded to Bouchard's office.  In fact, Dr. Paulshock had, at some point, taken the evaluations home, because that is where they were eventually located prior to their production to plaintiffs.  He testified that he simply forgot that he continued to possess the documents.

Attorney Bouchard received the single page evaluation summary and forwarded it on August 22, 1997 to plaintiffs, along with a cover letter.  Attorney Bouchard stated in his cover letter that "[t]here really is no personnel file as such, but upon significant search we were able to locate [Jackson's] evaluation form."  See Notebook, tab 7.  No evidence was offered as to the basis for the claim of a significant search producing this one page document, taken from among several pages and

19

received without cover letter or explanation.  Bouchard believed, erroneously, that the document had come from Dr. Ollar.  See Bouchard Exhibit B, 8/22/97 Bouchard-Fritton letter.  At the hearing, Attorney Bouchard could not recall upon what basis he stated that a significant search was made.

On August 27, 1997 plaintiffs sent Bouchard a draft motion to compel, seeking any and all records pertaining to Nurse Jackson.  See Notebook, tab 8.  Bouchard testified that he directed his associate, Robert Lietz, to call Dr. Ollar to clearly advise him that AA needed to immediately produce all documents in existence related to Elise Jackson's personnel or performance record.  See Bouchard Exhibit B, 9/8 Billing Record. Dr. Ollar offered no testimony regarding this telephone call.

On September 8, Attorney Bouchard sent plaintiffs' counsel, Mark Abramson, a letter stating that according to Dr. Ollar there was no personnel file and that the only personnel documents relating to Nurse Jackson had already been produced.  See Notebook, tab 9.  Both Dr. Ollar and Dr. Paulshock were copied on that letter.

Attorney Bouchard testified at the hearing that he met with Dr. Paulshock on September 15, 1997 to prepare him for his upcoming deposition.  He said that during that meeting he questioned Dr. Paulshock about the whereabouts of the individual

20

evaluations, and that Dr. Paulshock told him that the questionnaires were either lost or discarded.  Dr. Paulshock offered a strikingly different account of that same meeting; he testified at the hearing that the discussion on September 15 touched on the summary evaluation briefly, but that Bouchard did not ask about the questionnaires at all.  Dr. Paulshock further stated that he did not believe that Bouchard was aware of the existence of the questionnaires at that time.[23]

Plaintiffs first learned of the existence of the individual evaluations from Dr. Paulshock during his September 30 deposition.  See Bouchard Exhibit B, 9/30/97 Paulshock Deposition.  Dr. Paulshock stated at his deposition that he thought the evaluations might still exist but was not sure where they were and suggested that Dr. Ollar might have them.  See id.  Bouchard testified at the hearing that Dr. Paulshock's statement that the questionnaires might still exist came as quite a shock to him, considering that Dr. Paulshock had told him exactly the opposite two weeks earlier.

On October 8, 1997 Attorney Abramson sent Attorney Bouchard a letter requesting all evaluation questionnaires for Nurse

_____

[23] This testimony contradicts Dr. Paulshock's prior hearing testimony that he discussed the questionnaires with Bouchard in late June 1997, and that he told Bouchard's office about the questionnaires in July and again in August 1997.

21

Jackson.  See Notebook, tab 11.  On October 15, Bouchard sent another letter to Dr. Ollar requesting the questionnaires, and reported the same to Abramson.  See Bouchard Exhibit B.  On October 23, plaintiffs moved to amend the complaint to add an allegation of spoliation of evidence regarding the missing questionnaires.  See Notebook, tab 13.

Dr. Ollar, during his October 27, 1997 deposition, told plaintiffs that he had given the personnel evaluation summary and individual evaluations to Dr. Paulshock before the summer, so that Dr. Paulshock could turn them over to Bouchard and had assumed that he had done that.  See Bouchard Exhibit B, 10/27/97 Ollar Deposition.  On October 24, while cleaning up his desk, Dr. Ollar found Bouchard's October 15 letter to him requesting those documents.  Dr. Ollar immediately called Paulshock regarding this, and left a message on his voice mail.  Dr. Paulshock, who was away on vacation, returned Dr. Ollar's call on October 26 and told him that the evaluations were at his house.

Dr. Paulshock returned from his vacation in early November 1997.  He looked for the evaluations and found them in a pile in his kitchen.  Elise Jackson's evaluation questionnaires were given to Bouchard, who sent them to plaintiffs on November 14. See Notebook, tab 16.

## 3. Nurse Daley's Change in Deposition Testimony

Plaintiffs allege that during a break in the deposition of Patricia Daley, Attorney Bouchard coached Nurse Daley to change her testimony as to whether during the code Dr. Paulshock had told anyone in the OR about the administration of Nimodipine to Mr. Phinney.

On October 27, 1997, attorneys for plaintiffs, Mark Abramson and Randy Reis, deposed Nurse Janet Daley, an employee of AA. See Notebook, tab 14. Attorney Bouchard was also present. Nurse Daley stated that she overheard Nurse Jackson during the code inform Dr. Paulshock that she had administered Nimodipine to Mr. Phinney; she thought several people in the OR were aware that Nimodipine had been given, but she could state no basis for that belief. After some hesitation she stated that she did not recall whether Dr. Paulshock told anyone else in the OR about the Nimodipine. See id., 80-86.

At Attorney Bouchard's request, everyone took a short break from the deposition. After the break, Nurse Daley asked to correct her testimony and then told plaintiffs' counsel that she remembered Dr. Paulshock stating in the OR that the decedent had received Nimodipine. In subsequent questioning, Plaintiffs' counsel characterized Paulshock's statement as an "announcement to the OR," to which characterization she agreed. Daley had

23

spoken only with Bouchard during the break.  See id. 88-93.  No other deponent or witness has testified to hearing Dr. Paulshock say anything about Nimodipine.

At the hearing, Nurse Daley testified that she overheard Dr. Paulshock ask Nurse Jackson what medications were given, and overheard Nurse Jackson tell him that Nimodipine had been administered.  Nurse Jackson mentioned no other medications.  She then testified that she overheard Dr. Paulshock repeat "Nimodipine" back to Nurse Jackson in a conversational tone of voice, and that he made no announcement to the room.  She went on to state that she was wrong to agree with Attorney Reis' characterization at the deposition of Paulshock's statement as an announcement to the OR.  She stated that at that time she was nervous and never appreciated the distinction between "statement" and "announcement."  She also felt that Attorney Reis had put words in her mouth.  Finally, she testified that Dr. Paulshock told no other doctor entering the room about the administration of Nimodipine.

She testified at the hearing that at the break from her deposition she walked out with Attorney Bouchard and then proceeded to the restroom.  She stated that while in the restroom she recalled Dr. Paulshock's statement concerning Nimodipine.  She told this to Bouchard on the way back to the deposition.  She

24

testified that at no time did Bouchard ever counsel her to change her testimony or suggest an answer to her.

Attorney Bouchard testified at the hearing that he and Daley walked out of the deposition together. On their way to the restrooms he reassured her and urged her to calm down. On the way back from the restrooms, he testified that she told him she recalled Dr. Paulshock's statement concerning Nimodipine, and that he advised her to make this known to plaintiffs' counsel. He stated that he did absolutely nothing to elicit this additional or changed testimony.

In contrast to Nurse Daley's testimony, Dr. Paulshock testified at the hearing that when he entered the OR he inquired about what medications the patient had received, and Nurse Jackson advised him of a long list of medications, including Dilantin and Nimodipine. He further testified that he mentioned the administration of Nimodipine to several people as each one entered the OR, including specifically Dr. Briggs, as a part of a briefing on the situation in the OR.

**4. Attorney Bouchard's Conduct During Daley Deposition**

Plaintiffs' last allegation focuses on Bouchard's conduct during Nurse Daley's deposition. Plaintiffs allege that Bouchard made a number of improper speaking objections during the deposition of Patricia Daley, that he engaged in impermissible

25

coaching objections, and that he coached her during a whispered conversation during the deposition.

On May 19, 1997, this court issued a pretrial scheduling order stating that: "[a]ll counsel are ordered to refrain from coaching objections during depositions. Objections are limited to what is permitted in Court. See LR 39.1(a)(3)." Document no. 17. LR 39.1(a)(3) states that "[w]hen stating an objection, counsel shall state only the basis of the objection (e.g., "leading," or "nonresponsive," or "hearsay"). Under no circumstance shall counsel elaborate or present an argument or make reference to other evidence unless the court so requests."

During the deposition of Patricia Daley, Attorney Bouchard made several "speaking" objections, in which he suggested an answer, instructed the deponent to not answer or urged her to only answer the question asked. See e.g. Notebook, tab 14, 10/27/97 Daley Deposition, pp. 26, 28, 34, 54, 70, 71, 84, 93, 95, 99, 101, 102, 106, 110. On most of these occasions Bouchard did not "object" before making his statement. Once, Mr. Bouchard began whispering privately with Nurse Daley during the deposition. See id., 110-111. He also made objections to the form of the question over fifty times. See e.g. id., 15, 22, 24, 25, 29, 30, 35, 37, 39, 41, 42, 55, 61, 64-77, 83, 85, 88, 91, 94, 95, 104, 107, 108, 109, 112, 113.

26

At the hearing, Nurse Daley testified without equivocation that she understood that Bouchard was not her attorney, and that he was the attorney for AA. She testified that Attorney Bouchard, in preparing her for deposition, did not in any way suggest that his objections were a signal to her. She further testified that during the whispered deposition conversation Bouchard simply told her to calm down and just answer the question.

Attorney Bouchard testified at the hearing that he did not tell Nurse Daley to interpret his objections as messages to her. He stated that during the whispered conversation he told Nurse Daley to just calm down and answer the question. He conceded, somewhat grudgingly, that some of his deposition conduct constituted "technical" violations of the May 19 scheduling order. He added that he engaged in that conduct because he became impatient with Attorney Reis, who he felt was badgering the witness, but admitted that it was improper and stated that he regretted having done it.

## II. Discussion

### A. Plaintiffs' Sanctions Motion

Plaintiffs assert that: (1) defendants and/or their attorney fabricated evidence; (2) defendants and/or their attorney wrongly failed to comply with legitimate discovery requests; (3) Attorney

27

Bouchard coached a deponent to change her testimony; and (4) Attorney Bouchard engaged in impermissible speaking objections and coaching during a deposition. These allegations implicate this court's powers to sanction misconduct pursuant to Fed. R. Civ. P. 30(d)(3)(concerning proper deposition conduct), 16(f) and 37(b)(2)(concerning violations of pretrial or scheduling orders), and 26(g)(concerning abusive discovery practices). They also implicate the inherent powers of the court to sanction wanton or bad faith abusive practice.

A district court has broad discretion to sanction misconduct. See Chambers v. NASCO, 501 U.S. 32, 55 (1991); see also Whitney Bros. Co. v. Sprafkin, 60 F.3d 8, 11-12 (1st Cir. 1995). In general, the burden of proof is on the party seeking the sanction. See Rich Art Sign Co. v. Ring, 122 F.R.D. 472, 474 (E.D.Pa. 1988); cf. Cook v. Am. Steamship Co., 134 F.3d 771, 776 (6th Cir. 1997)(burden of proof on party seeking sanction pursuant to 28 U.S.C. § 1927). In exercising its discretion, the court should not ignore a material factor deserving significant weight, should consider all proper factors, and should avoid serious mistakes in weighing those factors. See Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1117-1118 (1st Cir. 1989). The court's imposition of sanctions is reviewable on appeal under an abuse-of-discretion standard. See Nat'l Hockey League v. Metro.

28

<u>Hockey Club</u>, 427 U.S. 639, 642-43 (1976); <u>see</u> <u>also</u> <u>Legault v.</u>
<u>Zambarano</u>, 105 F.3d 24, 26 (1st Cir. 1997).

### 1. Finding of Aerated Blood

Plaintiffs have not sustained their burden of proof to demonstrate sanctionable conduct in connection with the alleged fabrication of the Jorgensen memorandum. Plaintiffs' allegations implicate the inherent powers of this court to sanction bad faith or wanton litigation by suggesting that defendants have attempted to perpetrate a fraud on the court. The facts, however, do not warrant an inherent powers sanction against Bouchard, Paulshock or AA because the plaintiffs have not shown by clear and convincing evidence that the Jorgensen memorandum was made or produced in bad faith.

"The inherent powers of the federal courts are those which 'are necessary to the exercise of all others.'" <u>Roadway Express,</u> <u>Inc. v. Piper</u>, 447 U.S. 752, 764 (1980) (quoting <u>United States v.</u> <u>Hudson</u>, 7 Cranch 32, 34 (1812)). It is well settled that a district court may use its inherent powers to sanction a party who has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." <u>Chambers</u>, 501 U.S. at 45-46; <u>see</u> <u>Whitney</u> <u>Bros. Co.</u>, 60 F.3d at 13. The court may exercise its inherent powers to sanction a party for committing a fraud on the court

29

where "it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." See Aoude, 892 F.2d at 1117-1118. Clear and convincing evidence is evidence that is highly probably true. See Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 233 (1st Cir. 1983). It is proof beyond a well-founded doubt, more than a preponderance but less than is required in a criminal case. See Tatro v. Kerin, 41 F.3d 9, 15 (1st Cir. 1995).

Plaintiffs have not shown that Attorney Bouchard knew or believed that the Jorgensen memorandum was fabricated or that he failed to make a reasonable inquiry into the same.[24] Attorney Bouchard had a reasonable belief that he knew of the origins of the Jorgensen memorandum, since he in fact asked the doctors to record their recollections. Furthermore, Dr. Paulshock told Bouchard of the alleged finding of air within days of his engagement, and later showed Bouchard his QA report indicating

_____

[24] The fact that Attorney Bouchard made a "reasonable inquiry" under the circumstances into the basis and propriety of the Jorgensen memorandum rules out any sanction pursuant to Fed. R. Civ. P. 26(g).

the same. Attorney Bouchard had no reason to disbelieve his clients on this issue, or to go beyond their assurance that the information was accurate to the best of their knowledge. There was no evidence offered to establish that Bouchard played any role in Dr. Jorgensen's reconsidered, but undocumented, "air" finding. Defendants had made no use of the purported finding of air prior to plaintiff's request for the Jorgensen memorandum and still have not asserted "air" as a defense. The facts, therefore, do not support a sanction against Bouchard.

The key evidence in determining whether Jorgensen's memorandum is a fabrication done to protect the AA partnership is the testimonies of Dr. Miller and Dr. Jorgensen.[25] Of critical importance is the difference between what the doctors saw and what they interpreted their observations to mean. Other than the conclusions about whether what was aspirated was aerated blood from an air embolism, the testimonies are not significantly at odds. Dr. Miller testified that he observed Dr. Jorgensen aspirate three partially-filled syringes of blood from the patient and that one syringe of the three contained froth. Dr. Jorgensen testified that he aspirated several syringes of froth

---

[25] The testimony of Dr. Paulshock and Dr. Tobin are also relevant, but generally support Dr. Jorgensen's side of the story. They have, of course, the same motivation as Dr. Jorgensen to protect the assets of their professional corporation.

from the patient, having characterized his previous estimate of six or seven syringes as a "best guess."[26]  Dr. Jorgensen and Dr. Miller both stated that Dr. Jorgensen initially believed he was aspirating venous air due to an air embolism.  They were consistent in testifying that, in the OR, Dr. Miller was quite certain that what was being aspirated was not venous air.  Dr. Jorgensen testified that in the OR he was convinced by Dr. Miller that no "true" aerated blood was aspirated.  While the testimonies differ as to the total amount of blood or froth aspirated, the differences are not so significant in and of themselves to find that the Jorgensen memorandum is a fabrication under a clear and convincing standard.

The glaring inconsistency between the two doctors' testimony and conclusions is that in his memorandum and in his current testimony Dr. Jorgensen stated he aspirated aerated blood and Dr. Miller said he did no such thing.  The inconsistency, however, can be explained by the doctors' very different ideas of what aerated blood from a venous air embolism should look like.  Dr. Miller stated that he had previously seen the symptoms and effects of a venous air embolism, and definitely did not see those manifestations in Kenneth Phinney.  By contrast, Dr. Jorgensen demonstrated no such prior knowledge.  Dr. Miller

_____

[26] Paulshock says 3-4, and Tobin says 4-5 syringes.

32

testified that while he had seen true aerated blood before as a professor in Louisiana, he had never seen it aspirated at Wentworth-Douglass.  Nurse Daley also testified that she has never seen aerated blood at Wentworth-Douglass.  While Dr. Jorgensen did not specifically address this point, his practice has been primarily at Wentworth-Douglass, suggesting that he has never seen aerated blood from a venous air embolism.

Both Dr. Jorgensen and Dr. Miller described what they saw similarly, as blood with bubbles in it that frothed up in the syringe.[27]  Dr. Miller described true venous air embolism type aerated blood as resembling a meringue or beaten egg white, not just bubbly blood.  In his operative report, Dr. Miller also relied on the absence of a precordial whirling noise to rule out venous air embolism as a likely cause of death.  In contrast, Dr. Jorgensen testified that saw no significance in, and drew no conclusions from, the absence of a whirling noise in Mr. Phinney.  Finally, Dr. Jorgensen testified that in the OR he bowed to Dr. Miller's superior knowledge as to whether aerated blood was in fact being aspirated.

It is plain that Dr. Jorgensen did not have a clear idea of

---

[27] This description is also consistent with Dr. Tobin's observation.  Dr. Paulshock's did not describe what he saw, but was merely astounded by its great quantity.  Neither Dr. Paulshock nor Dr. Tobin established that they had ever previously seen aerated blood.

what aerated blood from a venous air embolism should look like. It is, therefore, not merely possible, but likely, that if Dr. Jorgensen and Dr. Miller had different ideas of what aerated blood from an air embolism looked like, that they could have seen the same frothy blood and drawn completely opposite conclusions as to its nature. The Jorgensen Memorandum, however "reconsidered" its basis may be, is consistent with Dr. Jorgensen's independent view during the resuscitation effort. There is, therefore, no clear and convincing evidence that the Jorgensen memorandum is an outright fabrication.

The remaining question is whether Dr. Jorgensen's change of heart some time after Mr. Phinney's death about the presence or absence of venous air was a good-faith reconsideration of his earlier opinion, or whether he intentionally stretched the truth to support his reconsidered opinion. The preponderance of evidence tends to show that there was, in fact, no credible finding of aerated blood from an air embolism. In addition, Dr. Jorgensen's conclusion is suspiciously convenient, given that without any doubt an employee of AA wrongly administered a drug moments before the arrest that could cause exactly the reaction that killed Mr. Phinney, exposing the partners of AA to significant liability. On the facts, it is entirely reasonable to infer bad faith on the part of Dr. Jorgensen.

A reasonable inference is not, however, the same thing as clear and convincing evidence. See Whitney Bros. Co., 60 F.3d at 14 (a factfinder's decision that one party's version of the events is more credible than the other party's is, without more, insufficient to justify a sanction). There is little direct evidence addressing Dr. Jorgensen's motivation, and his testimony did mention factors relevant to his reconsideration. For example, Dr. Jorgensen testified to seeing air bubbles in the lumen of the catheter, before it reached the syringe, which in his mind tended to discount the theory that the air in the syringe was due to a leak in the Luer-Lok. He also testified that Dr. Miller would have had a motive to downplay any finding of air, since the presence of an air embolism would likely be due to a surgical error, and thus increase Dr. Miller's potential liability.[28] This testimony provides evidence that on reflection Dr. Jorgensen concluded that he had been unduly influenced by Dr. Miller's opinion. It is sufficient to prevent plaintiffs from meeting their high burden of proof. In short, while the plaintiffs' allegation of wrongdoing was entirely reasonable and,

---

[28] On the stand Dr. Miller was very credible, forthright and knowledgeable. I have no difficulty concluding that Dr. Miller is right and Dr. Jorgensen is wrong. What is relevant here, however, is not Miller's credibility, nor whether aerated blood consistent with an air embolism was found, but whether Dr. Jorgensen upon reflection honestly rejected Dr. Miller's conclusion and reasserted his own conclusion in good faith.

35

in my opinion, proved on a preponderance basis, plaintiffs have not shown by clear and convincing evidence that Dr. Jorgensen intended to commit a fraud on the court.  Without such clear and convincing evidence, there is no basis for an inherent powers sanction.[29]

## 2. Nurse Jackson's Evaluation Questionnaires

### (a) Sanctions Pursuant to the Inherent Powers of the Court

The conduct of Dr. Paulshock and AA in connection with the production of Elise Jackson's evaluations is sanctionable under the inherent powers of the court.  See Chambers, 501 U.S. at 45-46; Aoude, 892 F.2d at 1117-1118.  A magistrate judge may apply an inherent powers sanction of costs and fees.  See Petroleum Ins. Agency, Inc. v. Hartford Acc. & Indemn. Co., 106 F.R.D. 59, 69 (D. Mass. 1985); cf. In re Miller, 14 B.R. 443, 446-48 (B.R. E.D.N.Y. 1981) (bankruptcy judge has jurisdiction to apply inherent powers sanctions based upon his equity

---

[29] The entire issue is in part moot as well.  One sanction sought by plaintiffs is that AA and Dr. Paulshock be precluded from asserting the presence of an air embolism as a defense in the matter.  In fact, the deadline for expert disclosure has passed, defendants have disclosed no experts that will speak to the "air" issue, and Attorney Bouchard stated that he will not assert a defense of air embolism at trial.  Defendants are, therefore, effectively precluded from asserting a defense of "air" at trial anyway.

jurisdiction).[30] Plaintiffs have shown by clear and convincing evidence that Dr. Paulshock intentionally withheld documents that he knew to be responsive to legitimate discovery requests.[31] Plaintiffs also have shown that Dr. Ollar, acting on behalf of AA, willfully failed to make a good faith search for documents in response to plaintiffs' discovery requests, and failed to supplement discovery responses that he knew to be inadequate. After a careful review of all the evidence of record, I conclude that their conduct is sanctionable.

---

[30] An Article I judge may not issue a contempt order absent a statutory grant of authority because the inherent power of contempt arises from Article III and is reserved to Article III judges. See In re Sequoia Auto Brokers LTD., Inc., 827 F.2d 1281, 1284 (9th Cir. 1987); see also 28 U.S.C. § 636(e) (providing that certain acts committed before a magistrate constitute contempt of the district judge). The inherent power to sanction litigation abuse by awarding costs and fees is distinct from the inherent power to hold someone in contempt, however, because the power to impose costs and fees "serv[es] the dual purpose of 'vindicat[ing] judicial authority without resort to the more drastic sanctions available for contempt of court, and mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy'". Chambers, 501 U.S. at 46 (quoting Hutto v. Finney, 437 U.S. 678, 689, n.14 (1978). Chambers ascribes this power to a court's equitable power concerning relations between parties and also its inherent power to police itself. See id. at 46.

[31] Dr. Paulshock is a representative of defendant AA, as well as an individual defendant in the case. Dr. Paulshock was acting on behalf of AA when he told Bouchard in June and again in September 1997 that the unproduced evaluations had been lost, both because the interrogatories requesting Elise Jackson's evaluations were directed to AA, and not Paulshock personally, and also because Paulshock was always AA's main point of contact with Bouchard.

Dr. Paulshock is primarily responsible for AA's failure to reasonably produce Elise Jackson's evaluations. Clear and convincing evidence exists that Dr. Paulshock knew that plaintiffs had requested all personnel documents related to Elise Jackson, that he intentionally withheld them from production, and that he lied about the matter to this court.

Dr. Paulshock had a motive to hide Elise Jackson's evaluations because they could significantly impact his liability for the death of Kenneth Phinney. The evaluations show that AA believed Nurse Jackson's job performance (including her technical competence) to be below average and that Dr. Paulshock believed her to be untrustworthy.[32] Yet despite this belief, Dr. Paulshock left Elise Jackson in charge of Mr. Phinney's anesthesia, during which time she administered the massive overdose of Nimodipine that probably killed the patient. Worse still for Dr. Paulshock, there is evidence to suggest that Nurse Jackson kept silent about her error, justifying Dr. Paulshock's evaluation of her as dishonest.[33] Finally, evidence that Elise

---

[32] AA, in the composite evaluation, rated Nurse Jackson as below average in technical facility, as well as below average in efficiency, honesty, personability, adaptability and dependability. Dr. Paulshock in his own evaluation rated Nurse Jackson's honesty as "poor."

[33] Dr. Miller testified that during the resuscitation effort he had asked Nurse Jackson what drugs were administered, and she omitted any mention of Nimodipine. Both Nurse Daley and Dr.

Jackson is dishonest discredits her testimony suggesting that Wentworth-Douglass is responsible for the overdose because someone in the hospital pharmacy told her that Nimodipine could be administered intravenously.[34]

Virtually none of Dr. Paulshock's testimony as to his handling of the evaluations is credible. Clear and convincing evidence contradicts Dr. Paulshock's hearing testimony that he never gave the individual evaluations to Attorney Bouchard because he never knew that they were responsive to plaintiffs' interrogatories. First, Dr. Paulshock has demonstrated a high degree of interest in this lawsuit from the start, rendering it most unlikely that he did not know of or understand the context of the interrogatories. Within a day of Mr. Phinney's death, he called AA's malpractice liability insurer. Attorney Bouchard, in the first instance, sent AA's interrogatories to Dr. Paulshock, and also followed up with Paulshock to obtain the personnel file. Dr. Paulshock requested that Bouchard's office provide him with

_____

Paulshock testified that while Elise Jackson told Dr. Paulshock about the Nimodipine, she did not tell him the critical information about its administration--namely, that an oral dose was administered intravenously, resulting in a massive overdose.

[34] During her June 27, 1997 deposition, Elise Jackson testified that she called the hospital pharmacy for instructions on the proper administration of Nimodipine, and that she followed the instructions that she received from the pharmacy. See Bouchard Exhibit B, 6/27/97 Jackson Deposition, p. 25.

copies of every _other_ party's interrogatories so that he could read them himself. He even attended Elise Jackson's deposition personally. I do not believe his testimony that he never read AA's interrogatories and did not know that he had a duty to produce those evaluations. Furthermore, Attorney Bouchard testified that he _told_ Dr. Paulshock shortly after the Jackson deposition that AA should hand over any evaluation documents pertaining to Elise Jackson.

Second, Dr. Paulshock's statement that Lynmarie Cusack and an unnamed clerical person both told him that the individual evaluations were not needed is also so unlikely that I decline to accept it. Neither claim is credible. Bouchard's memorandum to Cusack specifically asks her to obtain missing documentation. _See_ Bouchard Exhibit B, 6/30/97 Bouchard-Cusack Memorandum. It is also clear that the individual evaluations were responsive to the interrogatories, or at least would need to be reviewed by counsel for a determination as to whether they should be produced. Bouchard wrote to Dr. Ollar for Jackson's evaluation and also wrote to Gavin Fritton, the senior claims attorney for defendants' insurer, referencing the nurses' evaluations. _See_ _id._, 7/2/97 Bouchard-Ollar Letter _and_ Bouchard Exhibit B-1, 7/3 Bouchard-Fritton Letter. It is simply not believable that an associate who was entrusted with this task by the senior partner

40

would advise a client that he need not produce these documents.[35] Furthermore, Cusack's memorandum to the file does not support Paulshock's version of events. The memorandum indicates that Dr. Paulshock first told Cusack that no additional documents were available, and only then explained to her that there were "surveys" in addition to the summary evaluation.

Dr. Paulshock's unsubstantiated claim that a secretary in Bouchard's office told him not to produce the individual evaluations is also plainly incredible. Attorney Bouchard testified that his office has no record of such a call from Dr. Paulshock in August 1997, and that his office staff is instructed to refrain from giving any such advice as Dr. Paulshock claims he received.

Third, Dr. Ollar testified that when he found the summaries and questionnaires he knew that plaintiffs wanted them and gave them to Dr. Paulshock precisely so that Paulshock could in turn give them to Bouchard. This is inconsistent with Paulshock's contention that he had little or no idea why Ollar had given him

---

[35] During his hearing testimony, Dr. Paulshock maintained that the individual evaluations completed by each doctor were merely "questionnaires" or "surveys," not "evaluations," and, that they were not, therefore, responsive to interrogatories. This position is frivolous and disingenuous. The "questionnaires" and the "evaluation" are identical, except that each of the former is a single evaluation filled out by one physician while the latter is a composite of each physician's evaluation. See Notebook, tab 7 and tab 16.

41

the file.  It stretches, or even surpasses, the bounds of credulity for Dr. Paulshock to maintain that he received these documents with no idea why and then failed to ask Ollar or Bouchard what he should do with them.  Moreover, as just discussed, his knowledge of the litigation makes his claimed confusion impossible to believe.

Finally, Dr. Paulshock's hearing testimony that he had forgotten that he possessed the individual evaluations until reminded of their existence by Dr. Ollar in late October 1997 is incredible.  Dr. Paulshock had the full evaluation file physically in hand in mid/late August 1997 when he sent Bouchard the evaluation summary.  Three weeks later, Dr. Paulshock was copied on Bouchard's September 8 letter to Abramson, and Paulshock made no attempt to correct Bouchard's statement that plaintiffs had all available evaluations.  Attorney Bouchard testified at the hearing that at his September 15 meeting with Paulshock he asked Paulshock specifically about the individual evaluations and that Paulshock said nothing about them.[36]  During his September 30 deposition, a mere six weeks after he pulled Elise Jackson's composite evaluation from a file _full_ of individual evaluations, Dr. Paulshock told plaintiffs that he did

_____

[36] At the hearing, Dr. Paulshock denied that Bouchard asked him about the evaluations during the September 15 meeting.

42

not know whether his individual evaluation of Elise Jackson still existed or where it might be.[37]  Yet on October 26, during his telephone conversation with Dr. Ollar, Dr. Paulshock was able to recall not only that he had the evaluations, but that they were at his home.[38]

In the end, Dr. Paulshock did not disclose to either Attorney Bouchard or plaintiffs that he had the documents until Dr. Ollar told plaintiffs that Paulshock had them.  Once Dr.

---

[37] Q: So where is this form that you say you filled
out for Elise Jackson that led to the February-1996
evaluation?
A: You're referring to my personnel form?
Q: Yes, sir.  A: I don't know.
Q: You gave that to Dr. Ollar?  A: That's right.
Q: So that should be on file at Atlantic Anesthesia
somewhere; correct?  A: Not necessarily.
Q: Why not? A: Because we don't have very rigorous
filing systems.
Q: What does "rigorous" mean?  You throw stuff in the trash?
A: Correct.  Or it gets stored in various places and
not real organized.
Q: Is that a good way to practice?
    MR. BOUCHARD: Object to the form
A: It's been – we've had no problems with the
way we practice.
Q: No problems with what? A: With our organizational method.
Q: I take it that if I asked you to find that form,
you would not have the slightest clue where to look for it?
A: I would have a clue and I would – I would think that
Dr. Ollar might be able to put his hands on it.

Bouchard Exhibit B, 9/30/97 Paulshock Deposition, pp. 35-36.

[38] Dr. Paulshock was not even at home when he "realized"
that he had the documents; he was away on vacation when he
returned Dr. Ollar's call.

43

Paulshock knew that plaintiffs had been told that he had the documents, he was able to find the documents with ease. This sequence of events cannot be reasonably explained by a memory lapse or a good faith misunderstanding. I must, therefore, conclude that Dr. Paulshock's September 30 deposition testimony that he was ignorant of his evaluation's whereabouts was untrue, and that his hearing testimony that he had "forgotten" that he possessed the evaluation questionnaires is also false.

Furthermore, Dr. Paulshock was not a credible witness. His testimony was frequently evasive, he had convenient memory lapses, and he told multiple inconsistent versions of events.[39]

---

[39] On at least one occasion Dr. Paulshock was evasive, forgetful and inconsistent all at the same time. Dr. Paulshock testified at the hearing that he would be willing to keep a dishonest employee on his staff. He was then confronted with a statement made at his September 30, 1997 deposition that he would not permit someone who was less than honest to work for him. He was also reminded that during his deposition he said that he rated Elise Jackson a "three" for honesty in his personal evaluation of her, whereas, in fact, he had rated her as a "one" for honesty. Dr. Paulshock explained the discrepancy as a lapse of memory. He refused, however, to characterize his "one" as a "poor" rating, despite the fact that the evaluation sheet has a scoring scale whereby "1" is "poor," "3" is "average," and "5" is "excellent." See Notebook, tab 16. He claimed he never made the correlation when scoring Jackson that "1" equaled "poor," and that he never, therefore, rated Elise Jackson's honesty as "poor." He went on to argue that the term "average" was vague and meaningless, and that the term "below average" was similarly meaningless, so that Jackson could not be characterized as a "below average" employee on the basis of the evaluations. He did concede that he felt that Elise Jackson had been less than honest on some occasions, but he added that he did not feel the lack of honesty was a serious problem as far as her job performance was

In sum, there is clear and convincing evidence to indicate that Dr. Paulshock was intentionally hiding Elise Jackson's evaluations from plaintiffs.

Dr. Ollar, acting on behalf of AA, also bears responsibility for the failure to reasonably produce Elise Jackson's evaluations. AA had a duty to comply with plaintiffs' discovery requests, see Fed. R. Civ. P. 26(b)(1), and a duty to produce the evaluations to plaintiffs once they were found. See Fed. R. Civ. P. 26(e)(2). There is clear and convincing evidence[40] that Dr. Ollar did not make a good faith effort to look for Elise Jackson's evaluations even though he knew that they were responsive to plaintiffs' interrogatories. It is equally clear that he failed to ensure production of the evaluations once he had found them, even though he was aware of his duty to do so.

Dr. Ollar testified that during the spring and summer of 1997, AA owned one four-drawer filing cabinet located at Wentworth-Douglass Hospital, that many of AA's papers were kept there, and that he looked in that cabinet when searching for

concerned.

[40] It is not established that clear and convincing evidence is necessary to demonstrate wanton or bad faith behavior where an actual fraud on the court is not alleged. See, e.g., Aoude, 892 F.2d at 1117-1118. The question is irrelevant here, however, since there is clear and convincing evidence of bad faith conduct.

45

documents responsive to plaintiffs' interrogatories.  Dr. Ollar found the personnel documents disclosed on June 23, 1997 in that cabinet.  He inexplicably failed, however, to find the evaluations, which he knew even then were responsive, during the same search, despite the fact that the evaluations were in that same cabinet.[41]

Dr. Ollar testified that he thought at the time that the evaluations had been lost or discarded.  This explanation is simply not credible because the evaluations were created by him in order to protect AA from a potential lawsuit by Nurse Jackson regarding her termination.  It is highly unlikely that the documents would have been thrown away when they were still needed for their intended purpose.  It is plain that Dr. Ollar either did not want to find the evaluations or could not be bothered to make more than a cursory search for them.

Once Dr. Ollar found the documents, he had a duty to supplement his response to interrogatories on behalf of AA and disclose the evaluations to plaintiffs.  He clearly failed in that duty too, by giving the documents to Dr. Paulshock rather than Attorney Bouchard or plaintiffs, and by not following up

_____

[41] Dr. Ollar testified that he finally found the evaluations purely by accident during July or August 1997, further indicating that he did not look for them, even after Attorney Bouchard had specifically requested that he search for the summary evaluation.

46

with Paulshock as to the final disposition of the evaluations. Also, Attorney Lietz called him on September 8 concerning the evaluations, at which time he should have verified that Bouchard's office had received and disclosed the requested evaluations. Finally, Dr. Ollar was copied on Bouchard's September 8 letter stating that no more evaluation documents existed; this was yet one more lost opportunity to correct the record.

In sum, I conclude that Dr. Paulshock and Dr. Ollar, both of whom are partners and representatives of defendant AA, engaged in wanton or bad faith conduct in connection with the production of Elise Jackson's evaluations. Consequently, I shall impose sanctions pursuant to this court's inherent powers against AA and also against Dr. Paulshock personally due to his attempted fraud on the court. The extent of the inherent powers sanction is set forth below in section 2(c).

**(b) Sanctions Pursuant to Rule 26(g)**

The conduct of Attorney Bouchard, Dr. Paulshock and AA in failing to produce Elise Jackson's evaluation questionnaires in a reasonable fashion is also sanctionable pursuant to Fed. R. Civ. P. 26(g).[42] Rule 26(g)(2) requires that every response to a

---

[42] Conduct regarding the evaluations does not call for sanctions pursuant to Fed. R. Civ. P. 37(a)(4) because no motion to compel production was ever actually filed by plaintiffs.

discovery request bear the signature of the attorney, certifying "to the best of [his] knowledge, information and belief, formed after a reasonable inquiry" that the response is "(A) consistent with [the Federal Rules of Civil Procedure] . . .; (B) not interposed for any improper purpose . . .; and (C) not unreasonable . . .." Fed. R. Civ. P. 26(g)(2).  See Legault, 105 F.3d at 27 (applying Fed. R. Civ. P. 26(g)(2)).  Specifically, Rule 26(g)(2) requires a certifying lawyer to make a reasonable effort to assure that the client has provided all the information and documents that are available to him that are responsive to the discovery demand.  See id. at 28 (citing the Advisory Committee Notes to the 1983 amendments to Rule 26(g)).  The duty to make a reasonable inquiry is satisfied if the investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable under the circumstances.  See Advisory Committee Notes to the 1983 amendments to Rule 26(g) (emphasis added).  Fed. R. Civ. P. 26(g)(3) provides sanctions for violations of Rule 26(g)(2).

In an August 22, 1997 letter, Attorney Bouchard told plaintiffs' counsel that AA had made a "significant search" for documents responsive to plaintiffs' interrogatories and that this significant search turned up only Elise Jackson's evaluation

summary, which was attached. <u>See</u> Notebook, tab 7. The August 22 letter responded to plaintiffs' original interrogatory requests for personnel documents relating to Elise Jackson and to plaintiffs' specific follow-up request for Jackson's evaluation summary once the existence of that document had become known.[43] This letter, therefore, constitutes a "certification" pursuant to Rule 26(g)(2). <u>See</u> Fed. R. Civ. P. 26(g)(2); <u>cf</u>. <u>Markell v. Scoville Mfg. Co.</u>, 657 F.Supp. 1102, 1112 n.10 (W.D.N.Y. 1987) (a signed letter from counsel responding to a discovery request can be subject to a 1983 Rule 11 sanction).

Attorney Bouchard's certification violated Rule 26(g)(2) because the response was inconsistent with the Federal Rules, and because Attorney Bouchard's conclusions, as certified, were not reasonable. AA made little effort to find the evaluations in response to plaintiffs' interrogatories and no effort in response to their follow-up request for the summary evaluation. AA also had a duty to produce all of the evaluations to plaintiffs when they were found, which, of course, did not happen. Attorney

---

[43] Plaintiffs also suggested that AA had a duty to disclose in its response to interrogatories that the evaluations had once existed but had either been lost or discarded. Plaintiffs did not, however, ask AA whether documents which would have been responsive had ever been lost or destroyed. Plaintiffs' interrogatories 22 and 26 requested that certain categories of documents be <u>produced</u>. If a document no longer exists or cannot be found at the time it is requested, then it cannot be produced; the fact of its prior existence is not responsive to the request.

Bouchard's assertions in his August 22 letter were, therefore, incorrect and inconsistent with his client's duty to disclose these supposedly nonexistent documents.

While Attorney Bouchard did, in fact, make a reasonable effort under the circumstances to ensure that his clients complied with plaintiffs' discovery requests,[44] the conclusions he certified in his August 22 letter were not reasonably based upon his inquiry. Specifically, Attorney Bouchard had no basis for asserting to plaintiffs that the evaluation summary was found "upon a significant search" uncovering only the one document. Notebook, tab 7. First, no "significant search" ever took place. Dr. Ollar ran across the summary evaluation and all the subsidiary evaluations by accident while looking for something else. Second, Attorney Bouchard testified at the hearing that he could not recall the basis upon which he stated that a significant search had been made. Third, there is nothing in the record to suggest or demonstrate that AA and Bouchard communicated about what AA was actually doing to find responsive documents. When the evaluation summary finally turned up, it arrived in Bouchard's office out of the blue, with no cover

---

[44] After it became known that evaluations had existed for Elise Jackson, Bouchard immediately pursued the matter several times with both Dr. Paulshock and Dr. Ollar, and asked his associate to do the same.

50

letter or other indication of its origin. At the time of the August 22 certification, Bouchard made no effort to find out where the document came from, where it was found, or what other documents were found with it, despite his knowledge that there had been more documents, his misgivings about his clients, and the odd circumstances surrounding the document's arrival.[45] In short, Bouchard could not have known whether his clients had made a "significant search," but he nonetheless led plaintiffs to believe that every effort had been made to comply with their requests.

The fact that Bouchard's certification is not based upon a reasonable conclusion does not, however, render him responsible for the non-production of the evaluation questionnaires. I

---

[45] Bouchard first learned of a key document directly responsive to plaintiffs' interrogatories not from his clients, but from Elise Jackson during her June 27, 1997 deposition. This alone should have suggested to him that something was not quite right at AA; the speed with which he discussed the matter with Dr. Paulshock indicates that he did have some suspicions. Within days of the deposition he learned from Dr. Paulshock that additional evaluation documents responsive to the interrogatories had also existed. Bouchard knew by early July that his clients were slow to respond to document requests and were acting strangely with regard to Elise Jackson's personnel documents. See Bouchard Exhibit B-1, 7/3 Bouchard-Fritton Letter. Also, by July 10 Bouchard's associate knew with some detail what the additional documents were. In short, by the early summer of 1997 Bouchard knew that numerous evaluation documents had existed, he knew that those documents were responsive to discovery requests and probably probative, and he had a reasonable basis to suspect that his clients were being evasive on the subject of those documents.

address Attorney Bouchard's violative conduct because it is an essential element of a Rule 26(g)(3) sanction. Here, as discussed in detail above, AA, in the persons of Dr. Ollar and Dr. Paulshock, as well as Dr. Paulshock individually, bear the blame for AA's failure to produce the evaluation questionnaires. They should consequently bear the brunt of a Rule 26(g) sanction. A violation of Rule 26(g)(2) permits an appropriate sanction against the certifying attorney, his clients, or both. See Fed. R. Civ. P. 26(g)(3) and the Advisory Committee Notes on the 1983 Amendments to 26(g). An appropriate sanction can include an order to pay the reasonable expenses incurred because of the violation, including reasonable attorneys' fees. See id.

**(c) Sanctions Imposed**

Pursuant to the inherent powers of the court and, in the alternative, pursuant to Rule 26(g)(3)[46]: (1) I order AA to pay one half of plaintiffs' costs and attorneys' fees incurred in obtaining Elise Jackson's evaluations, and also to pay one half of plaintiffs' costs and attorneys' fees incurred in connection with their sanctions motion and the five day hearing on that motion; and (2) I order Dr. Paulshock personally to pay the remaining half of plaintiffs' cost and attorneys' fees incurred

---

[46] Sanctions available under the Federal Rules of Civil procedure do not displace or supercede the inherent power to sanction bad faith conduct. See Chambers, 501 U.S. at 46.

52

in obtaining Elise Jackson's evaluations, and also to pay one half of plaintiffs' costs and attorneys' fees incurred in connection with their sanctions motion and the five day hearing on that motion.  See Chambers, 501 U.S. at 50 (a court may impose a sanction of costs and fees under the inherent powers of the court).  In addition, pursuant to Rule 26(g)(3), I order Attorney Bouchard to pay plaintiffs $250.00 for attorneys' fees for his misleading August 22, 1997 certification.

### 3. Nurse Daley's Change in Testimony

Plaintiffs' allegation that Attorney Bouchard "coached" Nurse Daley during a break in her deposition to change her testimony, and by implication to testify falsely, primarily implicates this court's inherent powers to sanction bad-faith abusive misconduct.[47]  There is, however, no clear and convincing

_____

[47] It also marginally implicates my pretrial and scheduling order and Fed. R. Civ. P. 16(f) in that any conversation between Bouchard and Daley during the break could constitute coaching. See Hall v. Clifton Precision, 150 F.R.D. 525, 528-29 (E.D.Pa. 1993) (during a break from deposition a lawyer may only confer with a deponent who is his client, and only to determine whether or not to assert a privilege); but see Odone v. Croda Int'l PLC, 170 F.R.D. 66, 68 (D.D.C. 1997)(look to surrounding circumstances to determine whether consultation during break constituted impermissible coaching).  Since there was no attorney-client privilege between Daley and Bouchard, see Klonoski v. Mahlab, 953 F.Supp. 425, 427-31 (D.N.H. 1996), he should not have been conferring with her during the break.  The violation, however, is de minimis, considering the content of the discussion.  The trouble caused by the appearance of wrongdoing in this case is, however, an example of why the strictest propriety should be observed in taking depositions.

evidence of any conduct sufficient to support an inherent powers sanction.  See Aoude, 892 F.2d at 1117-1118.

The circumstances surrounding Nurse Daley's change in testimony would reasonably suggest that Bouchard improperly influenced her evidence.  As Nurse Daley testified at the hearing, she understood that Bouchard was not her attorney.  Before the break she stated that Dr. Paulshock said nothing about Nimodipine in the OR, and after the break she said that he had.  The changed testimony is helpful to her employer on the issue of liability.  No other evidence, except the testimony of Dr. Paulshock, supported her new recollection.  Bouchard suggested the break.  She spoke only with Bouchard during the break.  The circumstances were suspicious.

The evidence, however, resolves the suspicious circumstances.  Both Nurse Daley and Attorney Bouchard testified consistently and credibly that Bouchard in no way suggested that Daley change her testimony.  The change in testimony before and after the break while real, is not dramatic.  Before the break she said that she believed others in the room knew of the Nimodipine being administered, but could not recall a basis for that belief.  After the break, she remembered Paulshock saying "Nimodipine" after Nurse Jackson told him of its administration.  Plaintiff's counsel, in leading questioning, characterized his

54

statement several times as "an announcement to everyone in the room." Notebook, tab 14, p. 90. She accepted that characterization, but never used the term herself. At the hearing she testified she felt that plaintiffs' counsel was putting words in her mouth, and that she merely meant to say that Paulshock repeated "Nimodipine" after Nurse Jackson and others may have heard that.

This interpretation is consistent with what she actually testified to at the deposition, as opposed to what she agreed with. The evidence is not clear and convincing that Bouchard coached Daley to change her testimony. There is, therefore, no basis for an inherent powers sanction on this issue.

### 4. Coaching and Speaking Objections

Attorney Bouchard's conduct during Nurse Daley's deposition violated my May 19, 1997 scheduling order[48] as well as Fed. R. Civ. P. 30(c) and (d)(1).[49] The violations, while not egregious

---

[48] Fed. R. Civ. P. 16(f) states that in sanctioning noncompliance with a pretrial order, a judge: "may make such orders . . . as are just [including] any of the orders provided in Rule 37(b)(2)(B), (C), (D) [and] reasonable expenses incurred because of any noncompliance with this rule, including attorney's fees . . .." Rule 37(b)(2) parallels 16(f) but also permits a sanction pursuant to 37(b)(2)(A).

[49] Rule 30(c) states "[e]xamination and cross-examination of witnesses [during depositions] may proceed as permitted at the trial . . .." Rule 30(d)(1) states "[a]ny objection to evidence during a deposition shall be stated concisely and in a non-argumentative and non-suggestive manner. A party may instruct a

in kind, were numerous.  Attorney Bouchard interrupted plaintiffs' questioning without benefit of "objecting" first at least twelve times.  See Notebook, tab 14, 10/27/97 Daley Deposition, pp. 26, 34, 54, 70, 74, 84, 95, 99, 101, 102, 106, 110.  His objection or interruption contained a statement of more than a few words, a "speaking objection," at least eleven times. See id., 26, 28, 34, 54, 71, 84, 93, 95, 101, 102, 110.  Attorney Bouchard cautioned the witness not to answer the question several times, despite the fact that he did not represent Nurse Daley and that Nurse Daley understood that he was not her lawyer.  See id., 54, 70, 95, 102, 110.  Several times his interruption or objection suggested an answer to the pending question.  See id., 26, 71, 93, 102.  Once, he exchanged whispers with Nurse Daley during her questioning by plaintiffs' counsel.  See id., 110-111. None of this behavior would have been permitted in a courtroom; the conduct, therefore, violates my scheduling order as well as Fed. R. Civ. P. 30(c) and (d)(1).  Attorney Bouchard also made over fifty objections to the form of the question, many of which were ill-founded, suggesting that he was objecting simply to impede the flow of questions.

---

deponent not to answer only when necessary to preserve a privilege, to enforce a limitation on evidence directed by the court, or to preserve a motion under paragraph (3)."  Rule 30(d)(3) indicates that Rule 37(a)(4) sanctions are available, consisting mainly of an award of costs and fees.

While Attorney Bouchard explained his conduct as a response to what he perceived to be Attorney Reis' badgering the witness, he did concede at the hearing that some of his deposition conduct was inappropriate. Naturally, Mr. Bouchard regrets his conduct now, and expressed this regret at the hearing.

Mr. Bouchard's disregard for proper deposition conduct gave rise, in part, to plaintiffs' counsel's distrust of him. Depositions are formal proceedings even though they take place outside the courtroom and without the supervision of a judge. See Fed. R. Civ. P. 28(a). It is a matter of trust that attorneys, as officers of the court, are expected to police themselves and play by the rules. If an attorney engages in a pattern of behavior in deposition that he either knows or should know is improper, he depletes the reservoir of trust between attorneys, undermines the collegiality necessary to the efficient and amicable resolution of disputes, and unnecessarily requires court supervision of discovery.

This entire sanctions inquiry, with five days of hearings, myriad pleadings, hundreds of pages of testimony, lawyers defending and attacking lawyers, and client and counsel disputing each other, might have been avoided if the reservoir of trust between counsel had not been dissipated by deposition abuse and the unfounded overstatement concerning the evaluations. While it

is clear from the evidence that Mr. Bouchard did not engage in the most serious misconduct alleged or found, the circumstances, together with Mr. Bouchard's inadequate regard for the ground rules set down by this court, are substantial factors in the inability of counsel in this case to resolve discovery problems in a reasonable and amicable fashion.

In sum, I find that during the deposition of Patricia Daley Attorney Bouchard violated my pretrial and scheduling order (document no. 17) as well as Fed. R. Civ. P. 30(c) and (d)(1). I order him to reimburse plaintiffs for the stenographic cost of the Daley deposition, and further order him to write a letter of apology to attorneys Reis and Abramson for his deposition misconduct.

## B. Defendant's Motion to Strike and Request for Sanctions

### 1. Motion to Strike

Defendants seek to strike from the record plaintiffs' allegations of wrongful conduct by defendants and Attorney Bouchard. These allegations appear in plaintiffs' motion for sanctions (document no. 51) and supporting memorandum of law (document no. 96). Motions to strike are made pursuant to Rule 12(f), which provides that a "court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f)

58

(emphasis added).  See <u>Nault's Automobile Sales, Inc. v. American Honda Motor Co.</u>, 148 F.R.D. 25, 30 (D.N.H. 1993).

A motion for sanctions is not, however, a "pleading."  <u>See</u> Fed. R. Civ. P. 7(a) (defining a pleading as a complaint, an answer, a reply to a counterclaim, an answer to a cross-claim, a third-party complaint, or a third-party answer).  Rule 7(a) explicitly excludes everything else from its definition of a pleading.  <u>See</u> <u>Burns v. Lawther</u>, 53 F.3d 1237, 1241 (11th Cir. 1995).  Rule 12(f) applies only to pleadings.  <u>See</u> <u>Pilgrim v. Trustees of Tufts College</u>, 118 F.3d 864, 868 (1st Cir. 1997) (noting that Rule 12(f) has no applicability to motions made in pursuit of or in opposition to summary judgment).  Plaintiffs' allegations against defendants and Attorney Bouchard were not made in a pleading.  Consequently, Rule 12(f) is inapplicable to this case.  Defendants have offered no other grounds upon which the offending language may be stricken.  The motion to strike is, therefore, denied.

**2. Rule 11 Sanctions**

Defendants have also requested the imposition of sanctions against plaintiffs pursuant to Fed. R. Civ. P. 11.  A motion for a Rule 11 sanctions, however, must be brought <u>separately</u> from other motions or requests.  <u>See</u> Fed. R. Civ. P. 11(b)(1)(A).  Here defendants included a request for sanctions with the motion

to strike.  The request is, therefore, denied without prejudice to defendants' resubmitting it as a separate motion.[50]

### III. Conclusion

For the reasons stated above, I grant in part and deny in part plaintiffs' motion for sanctions (document no. 51) and order the following:

(1) for his overstated and misleading August 22 certification, Attorney Bouchard shall pay plaintiffs $250.00 in attorneys' fees; for his misconduct during the Daley deposition, he shall reimburse plaintiffs for the stenographic cost of that deposition and shall also write a letter of apology to attorneys Reis and Abramson;

(2) AA shall pay one half of plaintiffs' cost and fees incurred in obtaining Elise Jackson's evaluations, and shall also pay one half of plaintiffs' costs and fees incurred in connection with their sanctions motion, including the hearing;

(3) Dr. Paulshock personally shall pay one half of plaintiffs' cost and fees incurred in obtaining Elise Jackson's evaluations, and shall also pay one half of plaintiffs' costs and

_____

[50] A court may at its discretion sanction a party <u>sua</u> <u>sponte</u> under Fed. R. Civ. P. 11(b)(1)(B).  I choose not to do so because, as discussed above, plaintiffs' allegations were not unreasonable inferences from the facts then available, and were not unsupported by evidence.

fees incurred in connection with this sanctions motion, including the hearing.

The parties shall endeavor in good faith to agree on a reasonable fee amount.  If the parties cannot agree on a reasonable amount, plaintiffs shall submit a statement of attorneys' fees to the court, with a copy to defendants, for review on or before June 19, 1998.  The defendants shall object to any specific item(s) listed on or before June 26, 1998.

For the reasons state above, I deny defendants motion to strike (document no. 59).

**SO ORDERED.**

_____
James R. Muirhead
United States Magistrate Judge

Date: June 4, 1998

cc:  Randolph J. Reis, Esq.
     Robert G. Whaland, Esq.
     Wilfred J. Desmarais, Jr., Esq.
     Kenneth G. Bouchard, Esq.
     R. Peter Taylor, Esq.
     James Q. Shirley, Esq.
     Gregory G. Peters, Esq.
     Michael R. Lonergan, Esq.
     Christopher A. Wyskiel, Esq.

61